# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SUMMIT FINANCIAL RESOURCES L.P.,      )
)
)
     **Plaintiff,**      )
)
v.      )
)
BIG DOG ENTERPRISES LOGISTICS, )    Case No. 07-CV-0187-MJR-CJP
LLC, d/b/a FREIGHT HAULING )
LOGISTICS, THE HURSEY GROUP, )     CONSOLIDATED WITH
LLC, AGED ASSETS, LLC, )
COMMERCIAL PROPERTY )    Case No. 07-CV-0361-MJR-CJP
MANAGEMENT, LLC, HURSEY )
TECHNOLOGY, LLC, DAVID )
HURSEY, SUSAN HURSEY, and )
PEERLESS-PREMIER APPLIANCE )
CO., )
)
     **Defendants.** )
_____ )
PEERLESS PREMIER APPLIANCE )
CO., )
)
   Counterclaim/Interpleader Plaintiff, )
)
v. )
)
SUMMIT FINANCIAL RESOURCES )
L.P., )
)
   Counterclaim/Interpleader )
Defendant. )
_____ )
PEERLESS PREMIER APPLIANCE )
CO., )
)
   Cross-claim/Interpleader Plaintiff, )
)
v. )
)
BIG DOG ENTERPRISES LOGISTICS, )
LLC, d/b/a FREIGHT HAULING )
LOGISTICS, DAVID HURSEY, THE )
HURSEY GROUP, LLC, )
)

And )
)
**CSX INTERMODAL, INC., ESTES** )
**EXPRESS LINES, OVERNIGHT** )
**TRANSPORT-UPS FREIGHT,** )
**LANDSTAR RANGER, and** )
**SCHNEIDER NATIONAL CARRIERS,** )
)
**Cross-Claim/Interpleader Defendants.**

## ORDER

**REAGAN, District Judge**:

### A.  Introduction and Background

On March 15, 2007, Summit Financial Resources filed this action against Big Dog Enterprises Logistics, LLC, David Hursey, The Hursey Group, LLC, and Peerless-Premier Appliance Co. (Doc. 2).  The background allegations are as follows.  Big Dog did business as "Freight Hauling Logistics" and served as a freight broker, pairing shippers of goods with freight carriers.  Essentially, Big Dog helped obtain carriers to transport goods for a particular shipper as needed.  The shipper then tendered the goods to the carrier, along with the appropriate Bill of Lading.  Upon completion of the work, the carrier submitted an invoice and the appropriate Bill of Lading to Big Dog, and Big Dog would in turn collect payment from the shipper.  When the shipper submitted payment, Big Dog would take a commission and then remit payment to the carrier for their work.  Peerless was one of the shippers that worked with Big Dog on a regular basis.

At some point, Big Dog found itself in need of additional cash flow.  On October 31, 2006, Summit and Big Dog entered into a financing agreement, whereby Summit purchased Big Dog's accounts receivable at a reduced rate in exchange for working capital (Doc. 200-2, Exh. A).  David Hursey and The Hursey Group guaranteed the performance of all obligations due from Big Dog under the agreement.  Summit then sought to perfect its security interest on

October 26, 2006 by filing a UCC Financing Statement with the Delaware Secretary of State (Doc. 199-2, Exh. A; Doc. 200-3, Exh. B). Therein, Summit identified the collateral, in part, as:

> All accounts as defined in the Uniform Commercial Code, accounts receivable, . . . any rights to payment customarily or for accounting purposes classified as accounts receivable, and all rights to payment, proceeds or distributions under any contract of Debtor, presently existing or hereafter created, and all proceeds thereof (Doc. 200-3, Exh. B).

Big Dog then sent "Notices of Assignment" to its customers, informing them that it had assigned its accounts receivable to Summit and directing customers to make their payments to Summit. Unfortunately, Big Dog did not use the working capital to pay the carriers, and eventually defaulted on its loan with Summit. Thereafter, it was discovered that Big Dog had received payments from Peerless (and possibly other shippers), but failed to remit payment to the carriers. After learning of this, Peerless placed a "hold" on all payments it owed to Big Dog. According to the information in the record, Big Dog closed its doors in February 2007 and is no longer doing business.

In its complaint, Summit claimed that Big Dog breached the financing agreement and owes over $1 million of unpaid principal, and that Hursey and The Hursey Group are liable as guarantors. Additionally, Summit seeks recovery from Peerless of $436,603.06 owed to Big Dog for the provision of freight brokerage services. On March 6, 2008, Summit amended its complaint to name additional defendants, including First Bank, Aged Assets, and Hursey Entities (Doc. 217). Summit filed a second amended complaint on October 3, 2008 adding Susan Hursey as a defendant (Doc. 313).

David Hursey, The Hursey Group, and Big Dog (collectively referred to herein as "the Big Dog Parties") filed a cross-claim against Peerless, claiming that Big Dog should recover the $436,603.06 Peerless owes for freight brokerage services (Doc. 26). In their most recent

answer to Summit's amended complaint, the Big Dog Parties have not altered their cross-claim against Peerless (Doc. 278).

Peerless admits that it incurred $414,980.56 in net charges for Big Dog's freight broker services between March 1, 2006 and February 28, 2007, but denies that it owes $436,603.06 (Doc. 24, ¶¶ 33 & 45). Fearing the prospect of having to pay both Summit and the various carriers, Peerless filed cross-claims and counterclaims for interpleader pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 22** (Doc. 24). Peerless claims that it is an impartial stakeholder with no interest in the amount it owes, but that Summit and various carriers have competing claims to the stake. The stake consists only of those funds that Peerless owes Big Dog for freight brokerage services.[1] Peerless identified approximately thirty carriers that shipped goods to or from Peerless, as directed by Big Dog, none of which have been paid for their services

Most of these carriers have been terminated from the action, either through default judgment (*see* Docs. 126 & 157) or else voluntary dismissal (*see* Docs. 105, 134, 197, 227, & 272). Only the following carriers remain as active parties to the interpleader action: CSX Intermodal, Inc., Estes Express Lines, Overnite Transport-UPS Freight, Landstar Ranger, and Schneider National Carriers. Each carrier has alleged a right to portions of the stake and filed counterclaims and cross-claims against Peerless and Big Dog for amounts owed for their services, whether included in the stake or not (Docs. 51, 78, 127, 146 & 239).[2]

[1] It is not clear that Peerless can necessarily avoid double-liability by interpleading these funds. At a minimum, Peerless owes the full amount in the stake to either Summit or the carriers. That fact is not in dispute. But if Summit is entitled to take these funds, Peerless may still be liable to the individual carriers for unpaid services. Additionally, Peerless may be liable to the carriers for amounts other than those included in the stake.

[2] CSX filed a cross-claim against Big Dog for all amounts it incurred for freight services, totaling $227,813 (Doc. 127). However, CSX's cross-claim against Peerless, and the claim it has in the stake, only comes to a total amount of $211,088.71 (Docs. 127 & 128). Estes filed a

On June 20, 2007, Magistrate Judge Clifford J. Proud permitted Peerless to deposit $414,980.56, less the actual costs and expenses incurred for service of process (Doc. 76). Peerless then filed a bill of costs (Doc. 85) and deposited $409,980.56 with the Court (Doc. 98). This amount represents the stake in the interpleader action, even though Summit's underlying complaint and the Big Dog Parties's cross-claims allege that the total amount owed is $436,603.06. It is also worth noting that the individual carriers' claims to the stake, when aggregated, total $627,745.29.[3]

On February 15, 2008, Summit filed a motion for summary judgment on the interpleader claims (Doc. 198). On March 31, 2008, CSX, Estes, Landstar, Overnite, and Schneider each filed cross-motions for summary judgment on the interpleader claims (Docs. 249, 255, 258, 263, & 282). Additionally, Schneider filed a motion for summary judgment on its counterclaims against Peerless (Doc. 250). Though all of the motions seeking summary judgment on the interpleader action were ripe as of May 2008, the Big Dog Parties neither sought summary judgment, nor did they file responsive briefs to the motions for summary judgment. Accordingly, it appears that the Big Dog Parties have abandoned any claim to the stake they may have previously asserted.[4]

---

cross-claim against Peerless in the amount of $236,472.11 (Doc. 51), but later stated that its maximum claim to the stake is $314,422.58 (Doc. 260). Schneider filed a counterclaim against Peerless and a cross-claim against Big Dog, each for the amount of $19,784 (Docs. 91 & 146). Overnite filed a counterclaim against Peerless and a cross-claim against Big Dog, each for the amount of $77,000 (Doc. 239). Landstar filed a counterclaim against Peerless and a cross-claim against Big Dog, each for the amount of $5,450.

[3] The amounts initially claimed by certain carriers differ from the amounts requested in their motions for summary judgment. But in any case, it does not appear that the stake is of a sufficient size to fully satisfy all of their claims.

[4] On March 5, 2009, the Court stayed the entire case as to David Hursey and Susan Hursey, after they filed a suggestion of bankruptcy (Doc. 355). However, the stay does not prevent the Court from ruling on the cross-motions for summary judgment, as David Hursey abandoned any claim to the stake long before the suggestion of bankruptcy was filed.

Having fully reviewed the parties' filings, the Court hereby **GRANTS IN PART AND DENIES IN PART** Summit's motion for summary judgment on the interpleader claims (Doc. 198), **DENIES** the motions for summary judgment on the interpleader claims filed by Schneider (Doc. 249), CSX (Doc. 255), Estes (Doc. 258), Landstar (Doc. 263), and Overnite (Doc. 282), and **GRANTS** Schneider's motion for summary judgment on its counterclaims against Peerless (Doc. 250).

### B.  Standards Governing Motions for Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. 2008) (citing FED. R. CIV. P. 56 (c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and *Kreig v. Seybold*, 481 F.3d 512, 516 (7th Cir. 2007)). *Accord Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519 (7th Cir. 2008).

In ruling on a summary judgment motion, this Court must view the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co.*, 491 F.3d 625, 630 (7th Cir. 2007); *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).

The parties have filed cross-motions for summary judgment. The United States Court of Appeals for the Seventh Circuit has explained that when cross-motions for summary judgment are filed, "we look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 540, 643 (7th Cir. 2007) (quoting *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).

## C.  Analysis

The principal contention between the parties is whether or not the stake consists of "accounts receivable" in which Big Dog had rights.  As discussed above, the stake includes those amounts Peerless would have undisputably paid to Big Dog for freight brokerage services performed by Big Dog, which include amounts for shipping services provided by the carriers. The carriers claim that, if Big Dog had ever received these amounts, Big Dog would have held them in trust for the carriers, retaining only its commissions.  As a result, the carriers claim that Big Dog had no rights in these so-called "accounts receivable" whatsoever, and accordingly could not have pledged these amounts as collateral to Summit.  According to the carriers, because Big Dog had no rights in the alleged collateral, neither does Summit.

Summit, on the other hand, claims that the funds were not to be held in trust by Big Dog, but instead, Big Dog paid all carriers from its own general funds.  Summit claims that its perfected security interest in these "accounts receivable" gives Summit priority to the stake. Summit further claims that even if the funds were to be held in trust, Summit was a bona fide purchaser for value without notice of the trust.  As such, Summit claims that it is entitled to the entirety of the stake.

As a preliminary matter, the Court notes that it appears uncontested that Summit has taken all steps necessary to perfect its security interest in Big Dog's accounts receivable. Under the Illinois Uniform Commercial Code, a security interest attaches when (1) the creditor gives value, (2) the debtor acquires rights in the collateral, (3) the creditor and debtor agree that the security interest shall attach to the collateral, and (4) the debtor signs a written security agreement that describes the collateral.  **810 ILCS 5/9-203.**  A security interest in accounts receivable is perfected, and is therefore enforceable against third parties, when the financing statement has been filed and the security interest attaches.  ***Chicago Dist. Council of Carpenters***

*Pension Fund v. Tessio Const. Co.*, 2003 WL 21312664, *3 (N.D. Ill. June 4, 2003) **(unpublished).** "[A] security interest in after-acquired accounts receivable is perfected—assuming the appropriate UCC statement has already been filed—once the debtor completes the work and is entitled to collect payment for that work." *Id.* And once the security interest is perfected, the security interest has "priority over a conflicting unperfected security interest [and] . . . [c]onflicting perfected security interests . . . rank according to priority in time of filing or perfection." **810 ILCS 5/9-322(a).**

It is obvious that Summit and Big Dog undertook the appropriate steps in perfecting Summit's security interest in Big Dog's accounts receivable. Summit agreed to purchase Big Dog's accounts receivable and did in fact pay Big Dog substantial consideration for these accounts. On October 26, 2006, the parties completed a financing statement (Doc. 200-2, Exh. A) and filed it with the Delaware Secretary of State, Big Dog's state of incorporation (Doc. 199-2, Exh. A; Doc. 200-3, Exh. B). Insofar as Big Dog acquired rights in any accounts receivable, Summit appears to have a perfected security interest.

## 1. The Portion of the Stake that Constitutes Commissions Owed to Big Dog by Peerless

Peerless has interpled funds that it claims are due and owing on the Big Dog accounts. Given that all parties agree that Peerless's payments to Big Dog included a small commission for each shipment (see Doc. 255-3, Exh. B, ¶¶ 14 & 16), it is obvious that at least a portion of the stake is comprised of commissions owed to Big Dog. There also appears to be no question that Big Dog was entitled to convey any commissions to which it was entitled.

Accordingly, Summit is entitled to whatever portion of the stake constitutes Big Dog's commissions for the transactions in question. To this extent, summary judgment must be granted in Summit's favor. However, because the parties do not indicate what portion of the stake constitutes Big Dog's commissions, the Court cannot fully assess damages at this time.

## 2. Whether Big Dog held Payments in Trust

The primary question before the Court is whether, and to what extent, Big Dog acquired any rights in the funds interpled by Peerless. "It is axiomatic that a party granting a security interest has the power to do so only with respect to property in which it has an interest and then, only to the extent of its interest." *In re Classic Coach Interiors, Inc.*, **290 B.R. 631, 635 (Bkrtcy. C.D. Ill. 2002).** Summit claims that Big Dog had rights in the entire stake, because Big Dog paid the carriers from its own general funds. The carriers, on the other hand, claim that Big Dog had no rights in the funds, except perhaps any brokerage commissions therein, because Big Dog was to act merely as a conduit and accepted the payments only so that it could transfer those amounts to each carrier. As such, the carriers claim that, regardless of what Summit and Big Dog said or believed, Big Dog never had any right to pledge Peerless's payments as collateral. Rather, Big Dog was merely holding them in trust for the carriers.

Thus, the Court must first determine whether Big Dog merely held payments for the carrier's in trust. The Court notes that it is possible that Big Dog was obligated to treat each carrier's payments differently, such that payments were to be held in trust for one carrier, whereas that approach may not have been required with respect all other carriers.

### a. Overnite Transport–UPS Freight

It appears that Overnite Transport's Broker/Carrier Agreement with Big Dog creates an express trust. The Agreement was executed on August 15, 2005. Under the heading "Payments of Charges," the Agreement states:

> Broker further acknowledges and agrees that all monies collected by Broker for services provided by or on behalf of Carrier hereunder **are the property of Carrier, that Broker holds such funds in trust for Carrier,** and the Broker will promptly remit such monies to Carrier without deduction or offsets (Doc. 282-2, Exh. A, ¶5) (emphasis added).

The Agreement also states that while the shipper is ultimately liable to pay for shipping services, "Broker will be jointly and severally liable with each Broker Client for payment of freight charges incurred in connection with services rendered by Carrier on behalf of such Broker Client" (Doc. 282-2, Exh. A, ¶5).

Summit claims that the conduct of Overnite, Big Dog, and Peerless "superseded and replaced the terms of the Broker/Carrier Agreement" (Doc. 291). Summit points to the many bills of lading submitted by Overnite for its Peerless shipments, each of which are stamped "THIRD PARTY BILL TO PEERLESS PREMIER c/o FRHL" (Doc. 282-2, Exh. B). FRHL obviously stands for "Freight Hauling Logistics," meaning that Overnite was to collect its payment from Peerless through Big Dog. How that fact undermines Overnite's claim that Peerless's payments to Big Dog would be held in trust is a mystery. The express language of the Broker/Carrier Agreement specifically provides for this course of conduct: Big Dog was to collect payments from shippers for Overnite's services, hold those payments in trust for Overnite, and promptly remit the funds to Overnite. Furthermore, when Big Dog had possession of any such funds, the Agreement specifically provided that such payments "are the property of Carrier"—not Big Dog.

Summit also argues that the Broker/Carrier Agreement does not bind Peerless, because Peerless was not a party to it. Whether that Agreement binds Peerless, however, does not address the issue before the Court. Summit is only entitled to amounts in which it has a perfected security interest, and it can only have a security interest to the same extent that Big Dog had rights in those funds. The Broker/Carrier Agreement is undeniably relevant to the question of whether Big Dog, when in possession of payments for Overnite's services, had any rights to those payments. And the Broker/Carrier Agreement establishes that Big Dog only had limited rights in Peerless's payments to Overnite. Big Dog only held these payments in trust,

and the funds were the property of Overnite. It is clear that Big Dog was a mere conduit and was not permitted to put such funds to any other use than that designated by the Broker/Carrier Agreement.

Summit also argues that the funds were not held in trust because Big Dog, on at least some occasions, forwarded Peerless's payments to Summit. But the fact that Big Dog may have acted improperly does not mean that these payments were not to be held in trust. Similarly, Summit argues that the funds were not part of a trust because Peerless, on occasion, paid some of its Big Dog accounts directly to Summit. Whether such conduct by Peerless was proper is not at issue here, but Peerless's actions obviously do not affect the nature of the rights that Big Dog had in any funds.

Accordingly, it is clear that Big Dog's rights in any payments from Peerless to Overnite were strictly limited by the Broker/Carrier Agreement to that of a trustee, and the payments were explicitly designated as Overnite's property. In other words, Big Dog only held Peerless's payments to Overnite in trust.

### b. All Other Carriers

In contrast, no other carrier is able to establish that Big Dog expressly agreed to hold any payments in trust, whether from Peerless or another shipper. CSX's Broker/Carrier Agreement with does not require that Big Dog hold payments from shippers in trust. Rather, it appears to contemplate payment from Big Dog directly: "CSXI's payment terms are net fifteen (15) days from freight bill date for intermodal rail services, unbundled dray services . . . It is the intent of this Agreement to consider normal credit terms to be as follows: FRHL to make payment under this Agreement as set forth in CSXI's Corporate Trade Payment Electronic Funds Transfer Payment Agreement" (Doc. 255-2, Exh. A1). It is never made clear whether these

payments come from Big Dog's own funds, or whether Big Dog is to hold such funds in trust for CSX. Consequently, an express trust was not created by CSX's Broker/Carrier Agreement.

The Court is similarly unable to find that Landstar Ranger, Estes Express Lines, and Schneider National Carriers entered into any agreement with Big Dog expressly requiring that payments be held in trust. Estes admits that it never entered into a formal contract with Big Dog (Doc. 256-2, Jones Aff., ¶ 6). Landstar describes its "arrangement" with Big Dog, but never provides a Broker/Carrier Agreement, nor suggests that one exists (Doc. 261-2, Kimmey Aff., ¶ 6). Nor does Schneider ever indicate that it entered into any such agreement with Big Dog. Each does claim that Big Dog acted merely as a conduit through which Peerless could pay the carriers. But that allegation alone is not sufficient, in and of itself, to support a finding that an express trust existed.

Thus, the Court must now examine the record in order to determine whether a trust must be imposed on Peerless's payments relating to transactions involving Estes, Landstar, CSX, and/or Schneider, despite the absence of an express trust provision. As a preliminary matter, it is worth mentioning that Peerless's Chief Financial Officer submitted an affidavit, which states that Peerless understood that its payments to Big Dog "were intended (or ear-marked) to be paid to the carriers on their Bills of Lading. The only money due to Big Dog from the sums paid by Peerless would be Big Dog's small commission" (Doc. 255-3, Exh. B, ¶¶15–16).[5] While Peerless's speculation as to whether Big Dog was required to hold such

_____

[5] However, this position is somewhat undermined by the fact that, at least at some point, Peerless directly paid Summit a total of $197,563.42 after having been notified that Big Dog had defaulted on its loan to Summit (Doc. 285, Hadley Aff., ¶¶13–18; Doc. 285-3, Exh. B). The checks issued by Peerless to Summit are payable to "Freight Hauling Logistics c/o Summit Financial Resources" with Summit's address is listed below, or else directly to Summit (Doc. 285-3, Exh. B). It is not clear from the record, however, whether Peerless believed Summit would be responsible for paying the carriers' fees in the same manner that Big Dog was obligated to do.

payments in trust is not dispositive, it does shed some light on the general understanding between all parties as to how payments would be handled.

While there is little caselaw directly on point, the most closely analogous case upon which the carriers rely is ***Transportation Revenue Management v. Freight Peddlers, Inc.***, **2000 WL 33399885 (D. S.C. Sept. 7, 2000) (unpublished).** There, a freight broker arranged for five motor carriers to deliver freight for various shippers. The broker was to collect payment from the shippers for the carriers. However, the defendant broker never actually paid the carriers. Instead, one of the defendant's creditors, a bank, took possession of the payments claiming a security interest in the broker's "accounts receivable." The assignee of the five carriers brought suit to recover these payments, claiming that the broker could not have transferred the funds because they were merely held in trust and the broker had no rights in them.

The Court looked to federal statutes and regulations, in addition to the carriers' relationships with the freight broker, in order to determine whether a constructive trust should be imposed. ***Id.* at \*3.** Specifically, **49 C.F.R. § 371.3** provides:

> (a) A broker shall keep a record of each transaction. For purposes of this section, brokers may keep master lists of consignors and the address and registration number of the carrier, rather than repeating this information for each transaction. The record shall show:
>
>> (1) The name and address of the consignor;
>> (2) The name, address, and registration number of the originating motor carrier;
>> (3) The bill of lading or freight bill number;
>> (4) The amount of compensation received by the broker for the brokerage service performed and the name of the payer;
>> (5) A description of any non-brokerage service performed in connection with each shipment or other activity, the amount of compensation received for the service, and the name of the payer; and
>> (6) The amount of any freight charges collected by the broker and the date of payment to the carrier.

(b) Brokers shall keep the records required by this section for a period of three years.

(c) Each party to a brokered transaction has the right to review the record of the transaction required to be kept by these rules.

Additionally, **49 C.F.R. § 371.13** provides:

Each broker who engages in any other business shall maintain accounts so that the revenues and expenses relating to the brokerage portion of its business are segregated from its other activities. Expenses that are common shall be allocated on an equitable basis; however, the broker must be prepared to explain the basis for the allocation.

The Court further considered the broker's standard contract with motor carriers, which provided

a system of payment whereby the broker was responsible for collecting from the shipper, and

was ultimately expected to pay the carriers.

Analyzing the issue under federal common law, the Court explained:

Under the classic definition of a trust, "the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee." *In re Columbia Gas Systems Inc.*, 997 F.2d at 1059 (citing Restatement (Second) of Trusts § 2 cmt. F (1959); 1 A.W. SCOTT & W.F. FRATCHER, THE LAW OF TRUSTS § 12.2 (4th ed.1989)). Under federal common law, a trust is imposed "when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient." *Id.* at 1056 (citing *In re Penn Central Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir.1073)). In the absence of an expressly-created trust, "we look to the language of the parties, their conduct, and other circumstances surrounding the transaction probative of their intent." *Id.* at 1059 (citing *In re Penn Central Transp. Co.*, 486 F.2d at 524–27). In this case, the respective contracts between Freight Peddlers and the motor carriers provide that Freight Peddlers will perform all billing and collecting services from the party to whom the motor carrier delivers goods, and that Freight Peddlers will pay the carrier upon receipt of the bill of lading, "clear of exceptions," along with an invoice. In accordance with such practices, the federal regulations at 49 U.S.C. §§ 371.3(a)(4) and (6) clearly contemplate that brokers such as Freight Peddlers may act as a conduit by collecting freight charges owed to the motor carrier, and making appropriate payment to the carrier, less any brokerage charges.

*Id.* at *5.

However, the court found that the evidence was insufficient to fully determine whether the parties' conduct and the circumstances surrounding the transaction indicated an intent that the payments be held in trust. The court also explained that if the evidence showed that the broker paid carriers "from its own general funds before receiving the shippers' payments," then the imposition of a trust would probably not be warranted. *Id.* On the other hand, if the broker "simply forwarded the shippers' payments to the carriers, then it would be acting as a conduit, and federal law would call for the court to impose a trust." *Id.*

Other authority exists for this approach. In the context of a freight broker's bankruptcy proceeding, the Sixth Circuit explained why funds paid to the broker by a shipper were not part of the broker's estate. ***In re Computrex, Inc.*, 403 F.3d 807 (6th Cir. 2005).** In light of a Payment Agreement requiring that, after a shipper submitted payment, the broker must quickly transfer the funds to the carriers, the court found that the broker's control of the funds limited its function to that of a disbursing agent. ***Id.* at 811 (quoting the district court's decision, which explained that "[the broker's] brief possession of [the shipper's] funds was to be similar to that of a transfer station along the road to payment of [the shipper's] carriers.").** The court also rejected the argument that, by commingling the shipper's payments with the broker's general funds, the funds became part of the debtor's estate. Instead, the broker was likened to a bailee, lacking any property interest in the funds and merely holding them until the carriers could be paid. *Id.* **at 812. *See also In re Gulf Northern Transport, Inc.*, 340 B.R. 111, 122 (Bkrtcy. M.D. Fla. 2006) (explaining that under certain circumstances, a broker "would merely act as a conduit and hold [the shipper's] payments in a constructive trust for the benefit of [the carrier].").**

Here, the Court is unable to fully grasp the manner in which Big Dog did or was supposed to remit payment. The parties have not provided any affidavits or testimony

explaining how Big Dog actually dealt with or disbursed payments from shippers. CSX, Estes, Landstar, and Schneider claim that Big Dog acted as a mere conduit, and Peerless claims that the funds it submitted to Big Dog were "earmarked" for the carriers. Summit, on the other hand, claims that Big Dog paid the carriers out of its own general funds. Summit also suggests that when it paid Big Dog for accounts receivable, it understood that Big Dog would use the extra cash flow to pay the carriers (*see* Doc. 200, Hadley Aff., ¶¶ 9–14).

Obviously, without any further evidentiary clarification, the disagreement between the parties creates a genuine issue of material fact with respect to the question of whether a trust should be imposed on payments owed to Estes, Landstar, CSX, and Schneider.[6]

### 3. Whether Summit was a Bona Fide Purchaser without Notice

Even if Big Dog held all payments in trust for the carriers involved in this action, Summit may still be entitled to the funds in the stake if it can prove that it was a bona fide purchaser without notice of the trusts. Under Illinois law, "trust property cannot be followed and impressed with the trust as against one who occupies the position of bona fide purchaser for value without notice of the trust." *Lake City Corp. v. Michigan Ave. Nat'l Bank of Chicago*, **337 N.E2d 251, 255 (Ill. App. Ct. 1975) (citing 35 I.L.P.** *Trusts* **§ 226);** *see Frankel v. Otiswear, Inc.*, **576 N.E.2d 955, 961–62 (Ill. App. Ct. 1991) ("A '[b]ona fide purchaser for value is one who, without notice of another's claim of right to, or equity in, property prior to his acquisition of title, has paid a vendor a valuable consideration.'") (quoting BLACK'S LAW DICTIONARY 161 (5th ed. 1979);** *Hocking v. Hocking*, **484 N.E.2d 406, 410 (Ill. App. Ct.**

---

[6] Summit makes a half-hearted argument that if a trust is imposed, the amounts it already paid to Big Dog constitute the *res*, rather than the amounts Peerless interpled into the stake. That is clearly not the case. If Big Dog was to hold anything in trust for the carriers, it was whatever amounts the shippers paid, for it is the shippers' obligation to pay any freight charges, and the shippers' obligations are not fulfilled until the carriers receive payment.

**1985) ("[T]he beneficiaries' right to follow and reclaim trust property is cut off by the transfer to one occupying the position of a bona fide purchaser for value without notice of the trust.").**

There is no serious contention that Summit failed to pay value in exchange for the rights to Big Dog's "accounts receivable" from Peerless. Indeed, Summit repeatedly paid Big Dog approximately $400,000 for these accounts (Doc. 200, Hadley Aff., ¶ 18). The only remaining question is whether Summit had notice of the alleged trusts.

Summit argues that it did not have notice, because Big Dog made various warranties and representations, including, but not limited to, that Big Dog had sole and unconditional good title to the accounts, that the accounts were free from any encumbrances, and that there were no defenses or setoffs to payment of the accounts that could be asserted as a defense or counterclaim against Summit or Big Dog (Doc. 200-2, Financing Agreement, ¶ 17; Doc. 200, Hadley Aff., ¶ 10).

On the other hand, the carriers argue that Summit had constructive notice that the payments were to be held in trust, due to the nature of Big Dog's business and the accounts themselves. Indeed, it does appear that Summit may have simply accepted Big Dog at its word with respect to its warranties. There is no information in the record, either provided by Summit or any other party, to indicate whether Summit did any further inspection of Big Dog's payment procedures, the Peerless accounts, or any Broker/Carrier Agreements. As already noted above, the parties do not tell the Court whether Big Dog paid the carriers from its own general funds, whether it simply relayed payments, or whether some other procedure was followed. Of course, Summit and the carriers generally allege that Big Dog followed whatever payment procedure best serves its case, but there is no evidentiary support as to how Big Dog actually managed payments.

Summit apparently did know that the Bills of Lading required Peerless to pay the carriers, and that Big Dog was engaged in collecting from Peerless so as to ensure the carriers would be paid. But that alone would not necessarily indicate that funds were part of a trust for a particular carrier. Additionally, it is not entirely clear that further inspection of Big Dog's procedures, the Bills of Lading, or the accounts would have revealed that any payments were to be held in trust. Had Summit reviewed Overnite's Broker/Carrier Agreement, it would have learned that payments to Overnite were to be held in trust, but without further information, the Court cannot determine whether Summit was obligated to inspect each and every Broker/Carrier Agreement relevant to the Peerless accounts.

As a result, a genuine issue of material fact exists as to whether Summit can claim the status of a bona fide purchaser. Consequently, summary judgment cannot be granted in favor of Summit on this ground.

## 4. Whether the Carriers' Rights Under Bills of Lading are Superior to Summit's Interest

The carriers also argue that their right to payment from Peerless pursuant to the Bills of Lading entitles them to full recovery of the stake. The Bills of Lading are the contracts between each carrier and Peerless, ensuring compliance with "[t]he bedrock rule of carriage cases . . . that, absent malfeasance, the carrier gets paid." *Exel Transp. Servs., Inc. v. CSX Lines LLC*, 280 F.Supp.2d 617, 619 (S.D. Tex. 2003). Because the carriers never assigned their interests in these payment to Big Dog, they claim that Big Dog never had a right to these amounts. Consequently, they claim that the funds in the stake are not "accounts receivable."

The carriers do not point to any legal authority to support the contention that a carrier's interest under Bills of Lading negates a freight broker's interest in those amounts when it receives or channels such payments. But there is an evidentiary problem as well, and the issues involved in this inquiry are intertwined with many of those discussed above. It is

undisputed that the standard course of conduct was that Peerless would pay Big Dog the full amount stated on an invoice or Bill of Lading. Big Dog was then expected to pay the carriers. However, it is not clear whether Big Dog paid the carriers out of its own funds, as Summit claims, whether it merely forwarded payment, as the carriers claim, or whether some other procedure was followed. If Big Dog paid the carriers out of its own funds, it may in fact have had rights in the payments. Indeed, it appears that Big Dog was jointly liable for any amounts not tendered to the carriers, such that Big Dog's expectation of the shipper's full payment for each invoice may have given Big Dog an interest in each payment.[7]

Accordingly, the Court finds that genuine issues of material fact exist as to the nature of any right Big Dog may have had in Peerless's payments. Consequently, summary judgment cannot be granted in favor of the carriers on this ground.

**5.  Schneider's Motion for Summary Judgment as Against Peerless**

Finally, Schneider moves for summary judgment on its counterclaims for breach of contract, account stated, and unjust enrichment against Peerless as to all shipping fees owed for Schneider's transport of goods for Peerless, whether recoverable through the stake or not (Doc. 250). Schneider claims that Peerless has not paid on three invoices included in the stake, totaling $3,834. Schneider also claims that Peerless owes an additional $10,327 stemming from invoices that Peerless paid to Big Dog, and which Big Dog failed to pay over to Schneider (Doc. 252). Copies of all of Schneider's Bills of Lading and invoices related to these transactions have been provided to the Court (Doc. 252, Exhs. A, B, &C).

---

[7] As already discussed above, even if Big Dog had an interest in the payments as accounts receivable, that in and of itself does not necessarily bar the carriers from collecting from Peerless under the Bills of Lading. The carriers would obviously have to prove, irrespective of any interest Big Dog may have had, that Peerless is still obligated to ensure that the carriers receive payment. But that issue is not before the Court at this time.

Peerless has not submitted any response in opposition to the motion, even though the Court directed Peerless to file its response no later than May 5, 2008 (Doc. 266). FEDERAL RULE OF CIVIL PROCEDURE 56(e) provides that

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Additionally, **Local Rule 7.1(c)** provides: "Failure to timely file an answering brief to a motion may, in the court's discretion, be considered an admission of the merits of the motion."

It appears that Schneider's counterclaim against Peerless has merit, as it is supported by invoices and Bills of Lading corroborating that freight charges were incurred on Peerless's behalf. Additionally, the record includes documents indicating that there were in fact circumstances where Peerless paid Summit rather than Big Dog or the carriers (Doc. 285-3, Exh. B), though it is not clear to the Court whether any of the exhibits provided correspond to payments Peerless made to Summit on Schneider invoices

In any case, as Peerless has failed to timely respond, summary judgment must be entered in favor of Schneider and against Peerless with respect to Schneider's counterclaims. But because Schneider may have a claim to the stake in an amount up to $3,834, the Court can only assess damages against Peerless in the amount of $10,327 due and owing from those invoices for which Schneider was never paid. In the event that Schneider is unable to recover the outstanding $3,834 from the stake, Peerless will be liable for that amount as well. In any event, Schneider's recovery shall not exceed the aggregate sum of $14,161.

To the extent stated above, the Court **GRANTS** Schneider's motion for summary judgment on its counterclaims against Peerless (Doc. 250).

## D.  Conclusion

Having fully reviewed the parties' filings, the Court hereby **GRANTS IN PART AND DENIES IN PART** Summit's motion for summary judgment on the interpleader claims (Doc. 198).  Summit's motion is **GRANTED** only to the extent that the Court finds that Summit is entitled to the portion of the stake that constitutes Big Dog's commissions.  However, Summit's motion is **DENIED** in all other respects, because genuine issues of material fact remain with respect to whether Big Dog held Peerless's payments in trust, whether Big Dog had any rights in the payments whatsoever, and whether Summit is a bona fide purchaser without notice.

And because genuine issues of material fact exist as to these questions, the Court must also **DENY** the motions for summary judgment on the interpleader claims as filed by Schneider (Doc. 249), CSX (Doc. 255), Estes (Doc. 258), Landstar (Doc. 263), and Overnite (Doc. 282).

Additionally, the Court **GRANTS** Schneider's motion for summary judgment on its counterclaims against Peerless (Doc. 250) due to Peerless's failure to submit any response to the motion.  Accordingly, the Clerk of the Court shall be directed to enter judgment in favor of Schneider and against Peerless with respect to Schneider's counterclaims.  Schneider is entitled to recover $10,327 on its counterclaims against Peerless, and up to $14,161 in the event that Schneider cannot fully recover an additional $3,834 from the stake.

**IT IS SO ORDERED.**

**DATED this 31st day of March 2009.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**